UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Cedric Scott Anderson,

    Plaintiff,

v.

Paige Stager, in her personal
Capacity as the personal representative
of the estate of Gayle Holton,

    Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 19-106 (MJD/LIB)

---

    Plaintiff, *pro se*.[1]

    Elizabeth A. Sellers, Assistant Duluth City Attorney, Counsel for Defendant.

---

This matter is before the Court on Defendant's motion for summary judgment. [Doc. No. 134]

## I.    Background

Between 1:03 a.m. and 1:08 a.m. on March 5, 2013, St. Louis County 911 dispatchers received seven calls reporting sounds of a fight, yelling, and cries for

---

[1] Originally, Plaintiff was represented by counsel. On January 24, 2020, Plaintiff's counsel was suspended from the practice of law in the Courts of Minnesota, and on January 28, 2020, counsel became ineligible to practice in this District. Plaintiff was given many extensions in order to obtain new counsel, but he instead proceeded *pro se*.

1

help, and that a person, later identified as Plaintiff, was seen exhibiting concerning behavior near the intersection of 7th Street and Mesaba Avenue in Duluth, Minnesota. (Mathias Decl., ¶ 2, Exs. A-G).

The first caller reported a lot of banging and yelling in her building, and that a community police officer had been to the building earlier that evening, after Plaintiff's girlfriend had "OD'd or something." (Id. Ex. A; Veroeven Decl. Ex. 4 at 36-39).) The caller identified Plaintiff by his first name, and stated she did not know if he was trying to kill himself, or if he was just going crazy. (Id. at 37.)

The other callers that night reported calls of "Help" near the corner of 7th and Mesaba Avenue. (See generally, Id. Exs. B-G.) Some of the callers could see Plaintiff on 7th Street. (Id. Exs. C-F.) One caller told the dispatcher that she had seen "a gentlemen running around" near 7th Street and 1st Avenue, and that he had jeans on and no shirt and that he was yelling for help. (Id. Ex. C; Veroeven Decl. Ex. 4 at 28-29.) She said it looked like his hands were tied behind his back, and then later stated that he "just lost his jeans." (Id.) Later, she reported that Plaintiff got his pants off, that his hands were free, but that he was laying in the middle of the street yelling for help. (Id.) The dispatcher asked the caller if the

individual needed medical attention, and the caller responded "Um, yeah, like, mental. He doesn't look like he's too hurt though." (Id.) She further stated that he looked really distressed and that "a car was coming at him right now. He's laying in the middle of the road. . . . Oh, he's naked. He's running up to the car. It's a minivan." (Id.) The dispatcher told the caller that officers were on the way, and at 1:06 a.m., the caller reported that she saw the officer arrive. (Id.)

The first officer to arrive on the scene was Duluth Police Sergeant Gayle Holton. (Sackette Decl. ¶ 3.) Other officers also responded to the dispatcher's call for assistance near 7th Street and Mesaba Avenue. (Id. at ¶6.) When Holton arrived on the scene, he radioed "Well, I've got a naked guy layin' on the ground on 7th Street just off Mesaba here." (Matthias Decl., Ex. H; Veroeven Decl. at 5.) Holton told others on the radio that he did not plan to get out of his car, but he changed his mind when Plaintiff ran onto Mesaba Avenue. (Id.) Holton called for an ambulance to come "Code 3" (lights and sirens on). (Id.)

Shortly thereafter, Office June Sackette arrived. When she arrived, she saw Plaintiff naked, in the middle of 7th Street. (Sackette Decl. ¶ 3, Ceynowa Decl. Ex. I (Squad Video); Carroll Aff., Ex. D (Sackette Narrative Report)). Sackette states she had no reason to believe Holton used any force on Plaintiff before she

3

arrived. (Sackette Decl. ¶¶ 4, 11.) She saw no Taser wires, or barbs or skin injuries on Plaintiff. (Id. ¶ 4.) She further states that Holton did not mention using force. (Id. ¶ 5.)

Sackette believed that Plaintiff was a danger to himself or others. (Id. ¶¶ 3-8.) He was naked, incoherent and would not comply with instructions. (Id. ¶¶ 3, 7.) Given the time of year, the ground was slippery and portions of Mesaba Avenue were elevated, which posed additional hazards if Plaintiff were to jump or fall from the side of the road. (Id. ¶ 7.) Sackette believed that Plaintiff's behavior was consistent with people being intoxicated on synthetic drugs. (Id. ¶ 8.)

Officer Graves also responded to the 911 calls concerning Plaintiff, and as he was approaching the scene, he heard Sgt. Holton say he was at 7th and Mesaba and that a naked guy was running around in the street. (Doc. No. 33, Carroll Aff, Ex. E (Graves Police Report).) Upon approach, Officer Graves saw that Plaintiff was running around from squad to squad, screaming incoherently. (Id.) It was snowing, and slippery, and because Plaintiff was naked, it was hard to get ahold of him. (Id.) Officer Graves then told Sgt. Holton he was going to tase him to slow him down. (Id.) When Plaintiff had fallen, and was sitting on

the street, Officer Graves tased Plaintiff, and Plaintiff immediately fell backwards and rolled to his right after three seconds. (Id.) Officer Graves stated that from his experience, Plaintiff's actions were of someone who had been tased before and knew how to break the taser probes. (Id.) The right probe did break, therefore the taser no longer had any effect. Officer Graves noted that he continued to hold the trigger for 15 seconds while he grabbed him in an attempt to control him. (Id.) After that, Officer Graves reported that he removed the cartridge and put the taser back into his holster. (Id.) Eventually, with the help of other squads, they were able to place Plaintiff in handcuffs, and he was then transferred to St. Luke's Hospital. (Id.; Veroeven Decl. Ex. 4 at 7 ("MALE OFFICER 2: Okay, where's the ambulance? We've got him in cuffs. He's fightin' hard, though." DISPATCH: 10-4, you have him in cuffs at 1:13. I'll check (inaudible) Gold Cross. MALE OFFICER 2: Need more cops down here to hold him down, too, please.")

Plaintiff was deposed, and testified that he believes he was fully clothed, and was waiting calmly on the street for the police to arrive. (Veroeven Decl., Ex. 3 (Anderson Dep. at 11-14).) He further claims that immediately after Sgt. Holton arrived, Holton tased him multiple times, and that the shock caused him

5

to bounce from squad to squad. (Id. at 14-15.) Plaintiff further admitted that he could not recall the details, and that his memory is bad due to injuries he incurred in a car accident in 2003. (Id. at 38-40.) Plaintiff testified that he could not remember when he took his clothes off, but that he did so because he was being tased. (Id. at 16.)

When Plaintiff was brought to the hospital, sedation efforts were ineffective, therefore Plaintiff required intubation and ICU on propofol. (Veroeven Decl., Ex. 2 at 4.) An anal exam revealed $600 and a wrapper for synthetic marijuana. (Id.) One of his treating physicians, Dr. Schultz, contacted 911 to request that Duluth Police officers call the hospital. (Carroll Aff., Ex. D.) Dr. Schultz informed the police that he found six, one hundred dollar bills and a package of something in Plaintiff's rectum. (Id.) When the police returned to the hospital, the package looked to be suspected synthetic marijuana. (Id.)

Plaintiff was in the hospital for approximately one week, during which time he was treated for a variety of conditions, including symptoms of agitated delirium, mental health issues and frostbite. (Veroeven Decl., Ex. 2, Medical Records at 8-14.) While hospitalized, Plaintiff told his medical providers that he and his then girlfriend used drugs, including synthetic marijuana. (Id. at 6, 7.)

6

At the end of his hospitalization, Plaintiff was discharged to his home. (Veroeven Decl., Ex. 3 (Anderson Dep. at 32); Ex. 2 at 7, 8-9, 14.)  A few weeks later, Plaintiff was residing in and receiving treatment for synthetic marijuana use at Vinland Center.  (Id., Ex. 3 (Anderson Dep. at 36-37).)  Plaintiff sought emergency treatment for his toes on March 25, 2013, and notes from that visit indicate Plaintiff was at Vinland, and that his history and physical exam are most consistent with neuropathy from frostbite.  (Id.)

## II.     Procedural Posture

Plaintiff originally brought this action against multiple defendants, including a number of police officers, St. Luke's Hospital, Dr. Johnathan Schultz, City of Duluth, St. Louis County Sheriff's Department, Gold Cross Ambulance and paramedics.  Plaintiff asserted claims that his Fourth, Fifth and Fourteenth Amendment rights were violated through the use of excessive force and that he was subjected to cruel and unusual punishment when he was tased multiple times.  Plaintiff also asserted Monell claims against the City of Duluth, St. Luke's and St. Louis Sheriff's Department.  Plaintiff also alleged that he was falsely imprisoned in violation of his Fourteenth Amendment rights.

Defendants moved to dismiss all claims, and the motions were referred to Magistrate Judge Brisbois. In a Report and Recommendation dated November 19, 2019, the Magistrate Judge recommended the Court grant the motions to dismiss with the exception of the excessive force claim against Sgt. Holton. (Doc. No. 82 at 38.) This Court adopted the Report and Recommendation in its entirety. (Doc. No. 100).

### III.  Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. Celotex, 477 U.S. at 323. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)). The party opposing summary judgment may not rest on mere allegations or denials but must set forth specific

facts showing that there is a genuine issue for trial. Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## IV. Discussion

As set forth above, the only remaining claim is one of excessive force by Sgt. Holton[2] when he allegedly tased Plaintiff multiple times.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). A claim that law enforcement officers used excessive force is analyzed under the Fourth Amendment and its reasonableness standard. Id. at 394. The actions of law enforcement are to be judged from the perspective of a reasonable officer at the scene of the arrest, and whether the totality of the circumstances justified the level of the force used. Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990).

> Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."

---

[2] A suggestion of death was filed on October 7, 2019 indicating that Sgt. Gayle Holton had passed away on September 19, 2019. (Doc. No. 80.) Plaintiff moved to substitute Holton's wife, Paige Stager, who is the personal representative of Holton's estate. The motion was granted. (Doc. No. 113.)

Id. at 1081-82 (citations omitted).

Other factors relevant to assessing the objective reasonableness of force used by officers include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Ryan v. Armstrong, 850 F.3d 419, 427 (8th Cir. 2017) (citing Graham, 409 U.S. at 396).

The Court finds that summary judgment on the excessive force claim is warranted because the record demonstrates that Sgt. Holton did not tase Plaintiff. Plaintiff was tased, but by Officer Andrew Graves.[3] (Sackette Decl. ¶ 10; Veroeven Decl., Ex. 5.) In the "Use of Force Full Details" report completed with regard to the incident at issue, Officer Graves is identified as tasing Plaintiff,

---

[3] Plaintiff claims that he did not receive all taser logs. Based on its review of the record, the Court finds that there is no evidence that other logs relevant to this case exist. Regardless, such claim is no longer relevant as Plaintiff no longer contends that Holton tased him. Finally, Plaintiff had previously brought a motion to compel concerning these logs, and the Magistrate Judge denied the motion, finding "[t]here are no March 5, 2013 entries for Officer Holton on any Taser log." (Doc. No. 168 at 7, 8.)

and Sgt. Holton is identified as handcuffing Plaintiff.  (Veroeven Decl. Ex. 5 at 3).)  In addition, the "Subject Resistance Report" completed with regard to the incident at issue identifies Officer Graves (#453) as deploying two taser discharges.  (Id. at 4.)

Further, the record does not support Plaintiff's claim that he undressed and otherwise behaved erratically because he was tased is not supported by the record.  As noted above, the record includes 911 calls made before the police arrived on the scene.  One caller reported at 1:05 a.m. that Plaintiff had no shirt on (Veroeven Decl. Ex. 4 at 25), and another caller reported at 1:05 a.m. that she observed Plaintiff running around with no shirt, then witnessed him take off his pants.  (Id. at 28.)  The radio dispatch from Holton demonstrates that at the time of his arrival on the scene at 1:06 a.m., Holton stated "I've got a naked guy layin' on the ground on 7th Street just off of Mesaba here."  (Id. at  5.)  Holton then stated "Uh, I'm not getting out of my car until he gets away from it."  (Id.)

The record further demonstrates that Holton did not otherwise use excessive force against Plaintiff that night.  Plaintiff was acting erratically, which prompted numerous 911 calls and caused multiple officers to respond.  Officer Sackette stated when she arrived on the scene, Plaintiff was naked and erratic.

11

(Sackette Decl. ¶ 3.) She observed Plaintiff darting in and out of the intersection, and going randomly from one emergency vehicle to another. (Id. ¶ 7.) She noted that there was concern because sections of Mesaba Avenue are elevated and that Plaintiff could jump or fall. (Id.) In addition, the road conditions were icy, and there was concern Plaintiff could get injured from falling on the ice. (Id.) Sackette believed Plaintiff posed a risk to his safety, and tried to get Plaintiff to get into her patrol car, but he would not comply. (Id. at ¶¶ 8-9.)

Officer Graves also noted in his report that numerous attempts were made to secure Plaintiff, but he did not comply with the officer's requests, so Graves told Holton he would tase him so Holton could place him in handcuffs. (Doc. No. 33, Carroll Decl., Ex. E (Graves Report).) Holton told him not to tase Plaintiff while he was running, so Graves waited until Plaintiff slipped and fell and tased him in the back. (Id.) With the help of several other squads, Plaintiff was placed in handcuffs and transported to St. Luke's Hospital. (Id.)

Based on this evidence, the record demonstrates that Plaintiff was tased, then handcuffed, because he would not comply with the officer's instructions, and that the officers were concerned for Plaintiff's safety if he was not subdued and taken off the street. Under similar circumstances, when a plaintiff is acting

erratically or is intoxicated, use of handcuffs has not been considered an excessive use of force.  See e.g., Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) (driver was acting erratically and not cooperating with officer's instructions and it was only later learned that the driver was in a diabetic shock); Rasmussen v. Larson, 863 F.2d 603, 605 (8th Cir. 1988) (handcuffing intoxicated man to take into protective custody not excessive force); Kaleta v. Johnson, Civil No. 12-170 (JNE/FLN), 2013 WL 3448148, at * 7-8 (D. Minn. July 9, 2013) (driver was acting erratically and not responsive to officer's instructions, therefore use of handcuffs not excessive force).

The fact that Plaintiff may have suffered minor scrapes and bruises and/or a less than permanent aggravation of a prior injury are *de minimis* injuries that support a finding the officer did not use excessive force. Wertish, 433 F.3d at 1067.

Plaintiff also argues that even if Holton did not tase him, he was a Sergeant and therefore in charge of the officers at the scene.  Plaintiff asserts that he only received the taser logs from the City of Duluth which support the City's position. Under Section 1983, however, claims cannot be supported on a theory of

vicarious liability.  Robbins v. Becker, 794 F.3d 988, 993 (8th Cir. 2015); Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010).

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 134] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date:  March 14, 2022

                                            s/Michael J. Davis
                                            Michael J. Davis
                                            United States District Court